# United States Court of Appeals
## For the Eleventh Circuit

No. 08-15704

District Court Docket No.
07-00056-CR-4-RH-WCS

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Aug 14, 2009

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

versus

CARLOS ANDRES MONSALVE,
a.k.a. Toty,
a.k.a. Toti,
a.k.a. Sebastian,

    Defendant-Appellant.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

Appeal from the United States District Court
for the Northern District of Florida

---

JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
SEP 25 2009
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered: August 14, 2009
For the Court: Thomas K. Kahn, Clerk
By: Clark, Djuanna

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 08-15704
Non-Argument Calendar

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00056-CR-4-RH-WCS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLOS ANDRES MONSALVE,
a.k.a. Toty,
a.k.a. Toti,
a.k.a. Sebastian,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Florida

(August 14, 2009)

Before TJOFLAT, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Defendant-Appellant Carlos Monsalve appeals his 240-month sentences for multiple offenses involving the transporting, harboring, and importing of illegal aliens for the purpose of prostitution. After review, we affirm.

## I. BACKGROUND

On appeal, Monsalve challenges two of the district court's advisory guidelines calculations. Specifically, Monsalve appeals the district court's fact findings that (1) he caused two victims ("Victims 1 and 2") to engage in sexual acts by placing them "in fear," which triggered a higher base offense level, and (2) Victims 1 and 2 were vulnerable victims, which increased his base offense level by two levels. We first review the procedural history and Monsalve's offense conduct on which the district court based these findings.

### A. Indictment

In 2007, Monsalve and four codefendants were indicted on 11 counts. Count 1 charged Monsalve with conspiracy to defraud the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 18 U.S.C. § 371, with four objects of the conspiracy: (1) knowing that force, fraud, and coercion would be used to cause a person to engage in prostitution, transporting, recruiting, and harboring such a person to receive a benefit; (2) transporting illegal aliens for the purpose of commercial advantage and private financial gain; (3) knowingly importing female

aliens and harboring them for purposes of prostitution; and (4) knowingly transporting, or attempting to transport, aliens with the intent that they engage in prostitution. The indictment also charged Monsalve with sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2 (Counts 2, 3, and 4); transporting and harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), (B)(I) (Count 5); aiding and abetting the importation of aliens for the purpose of engaging in prostitution, in violation of 8 U.S.C. § 1328 and 18 U.S.C. § 2 (Counts 6, 7, and 8); and aiding and abetting the transportation of aliens for prostitution, in violation of 18 U.S.C. §§ 2421 and 2 (Counts 9, 10, and 11).

**B. Plea and Offense Conduct**

Pursuant to a plea agreement, Monsalve pled guilty to Counts 1 and 5 to 11. Monsalve admitted that he was guilty of Objects 2 through 4 of the Count 1 conspiracy charge. However, Monsalve specifically did not plead guilty to Object 1, which charged him with transporting, recruiting, and harboring a person while knowing that force, fraud, and coercion would be used to cause that person to engage in prostitution.

Monsalve's presentence investigation report ("PSI") detailed his offense conduct. In 2005, Monsalve and others began smuggling women into the United States and making them work as prostitutes until they paid off their smuggling

3

fees. Monsalve paid someone in Guatemala to recruit women to the United States to work as prostitutes. Monsalve also used a contact in Costa Rica, who recruited Colombian women for Monsalve and provided fraudulent passports and identification cards. Most of the women knew they would work as prostitutes in the United States, but Victims 1 and 2 were promised legitimate work.

Monsalve charged the Guatemalan women a $15,000 to $16,000 smuggling fee and the Colombian women a $20,000 smuggling fee.[1] The women were expected to work six to seven days a week and have sex with approximately 20 to 25 men a night. Monsalve typically charged customers $30 for 15 minutes of sex. Monsalve and his group kept all of the proceeds and applied $15 of each transaction to that woman's smuggling debt. After a woman worked off her smuggling debt, which generally took three to four months, the woman could continue to work as a prostitute and keep $15 from each transaction.

Monsalve ran the daily operation of the conspiracy, which operated out of Tampa, Jacksonville, and Tallahassee, Florida. Each city had its own manager, each of whom was indicted as a codefendant. The women rotated among cities on a weekly basis. Monsalve and his codefendants provided residences for the women, delivered them to customers, and transported them from city to city.

---

[1] Testimony at Monsalve's sentencing hearing indicated that these smuggling fees were significantly higher than average.

Victims 1 and 2 were recruited from Guatemala and, unlike most of the other women recruited, were promised high-paying, legitimate jobs in the United States and assistance in becoming United States citizens. After being smuggled into the United States and transported to Tallahassee, the women were picked up by Jorge Melchor, one of Monsalve's codefendants.[2] Melchor told Victims 1 and 2 that their job was to have sex with men in order to repay their debts and that they should have been told that in Guatemala. On the day they arrived in Tallahassee, Melchor drove Victims 1 and 2 to shop for clothes and then to various residences where they had sex with numerous men.

The next day, Melchor received a call from Monsalve. Melchor told Monsalve that Victims 1 and 2 did not want to have sex with more men. Monsalve talked to Victims 1 and 2 and insisted that they had to go back to work. Melchor threatened the women that, if they attempted to flee, he would find them and bring them back and that, if they went to the police, they would be deported. Victim 2 had sex with more men later that day. The following day, Victims 1 and 2 fled from the Tallahassee house.

### C. PSI's Advisory Guidelines Calculation

The PSI applied the multiple count aggregation rules under U.S.S.G.

---

[2] Melchor was convicted, and his appeal is in the briefing stage.

5

§ 3D1.2 to determine Monsalve's offense level.³ The PSI grouped Objects 2 and 3 of Count 1 and Counts 6 to 11 by victim for each of the 16 victims, providing 16 count groups, and calculated the offense levels for these 16 count groups under § 2G1.1.⁴ See U.S.S.G. §§ 2G1.1(d)(1), 3D1.2(b). The PSI also identified a 17th count group, which addressed the conduct reflected in Object 4 of the conspiracy, as well as Count 5, and calculated the offense level for this 17th count group under § 2L1.1.

Monsalve's challenges on appeal focus on count groups 1 and 2, which addressed the conduct related to Victims 1 and 2. In calculating the offense level for count groups 1 and 2, the PSI noted that § 2G1.1 set Monsalve's base offense level at 14. The PSI applied several enhancements under § 2G1.1, including a four-level enhancement under § 2G1.1(b)(1) because Monsalve coerced Victims 1 and 2 into engaging in prostitution.⁵ The PSI initially determined that the adjusted offense level for count groups 1 and 2 of the 17 count groups was 26.

The § 2G1.1 enhancements and this initial adjusted offense level of 26 became irrelevant, however, when the PSI next reported that Monsalve caused

---

³The PSI used the 2007 Sentencing Guidelines.

⁴According to the PSI, the government identified at least 16 alien women with whom defendant Monsalve was involved for the purpose of prostitution.

⁵"Coercion" is defined in Application Note 2 of § 2G1.1 as conduct that "negates the voluntariness of the victim."

Victims 1 and 2 to engage in a sexual act by placing them in fear.[6] Based on this finding, the PSI stated that the cross-reference in § 2G1.1(c)(1) applied and required that § 2A3.1 be used to calculate Monsalve's base offense level.[7] Under § 2A3.1, Monsalve's base offense level for count groups 1 and 2 was 30. The PSI then recommended several enhancements, including a two-level, vulnerable-victim enhancement under § 3A1.1(b). Monsalve's final adjusted offense level for each of count groups 1 and 2 was 38. Ultimately, after a two-level increase under § 3D1.4, Monsalve's final, combined adjusted offense level was 40.[8]

---

[6]Section 2G1.1, the guideline for the crime of promoting prostitution, includes a cross-reference providing that, "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242, apply § 2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse)." U.S.S.G. § 2G1.1(c)(1) (2007). For purposes of this cross-reference, conduct described in 18 U.S.C. § 2242 includes an attempt to "engag[e] in, or caus[e] another person to engage in, a sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)." Id. § 2G1.1 cmt. n.4(B)(i).

[7]In United States v. Pipkins, 378 F.3d 1281, 1300-01 (11th Cir. 2004), vacated, 544 U.S. 902, 125 S. Ct. 1617 (2005), opinion reinstated by, 412 F.3d 1251 (11th Cir. 2005), this Court distinguished the conduct that triggers the coercion enhancement under § 2G1.1(b)(1) from the conduct that triggers the cross-reference in § 2G1.1(c)(1), as follows: "a pimp's threatening a prostitute to coerce her to stay in his custody would . . . satisfy the enhancement (which requires prostitution plus coercion) but not the cross-reference (which requires coercion to perform a sex act)." We also stated in Pipkins that, because the cross-reference would not always subsume the enhancement, "some overlap in the enhancement and the cross-reference does not offend the Sentencing Guidelines or any other law." Id. at 1301. The mandatory language in the cross-reference demanded that, "when there is this overlap, the judge must apply the cross-reference." Id.

[8]Section 3D1.4 provides that:
The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

7

The PSI recommended a denial of any adjustment for acceptance of responsibility because "[t]he defendant has failed to accept personal responsibility for his involvement in the offense as required by § 3E1.1."

**D. Objections to the PSI**

Before sentencing, Monsalve objected to, <u>inter alia</u>, the preliminary four-level enhancement under § 2G1.1(b)(1) and the application of the cross-reference in § 2G1.1(c)(1) on the grounds that there was no coercion or fear.

The government responded with excerpts from the testimony of Victims 1 and 2 at Melchor's trial, which the government claimed demonstrated that Monsalve placed Victims 1 and 2 in fear. At Melchor's trial, Victim 1 testified that she worked as a waitress in Guatemala and was led to believe that she could continue to work as a waitress if she used a smuggler to enter the United States. After smugglers helped Victim 1 enter the United States, her identity documents were taken from her. Upon arriving in Tallahassee, Melchor informed Victim 1

---

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1 1/2 | add **1** level |
| 2 | add **2** levels |
| 2 1/2 - 3 | add **3** levels |
| 3 1/2 - 5 | add **4** levels |
| More than 5 | add **5** levels |

In determining the number of Units for purposes of this section:
(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious . . . .

that she had to work as a prostitute. That same day, she was taken to approximately 10 residences and had sex with one to six men at each location.

During that time, Victim 1 complained, and Melchor responded that she had to have sex with more men before he would take her back home. Victims 1 and 2 did not tell Melchor that they had been promised jobs as waitresses because they feared that Melchor would then watch them closely, making escape impossible. After having sex with several men, Victim 1's genitals hurt and Victim 2 was bleeding. The next day, Victims 1 and 2 refused to go to work, and Melchor telephoned Monsalve. Monsalve told the women that they had to keep working to pay off their debts. Victim 2 went out and had sex with more men.[9]

### E. Sentencing

At sentencing, the government called Melchor to testify. Melchor stated that he picked up Victims 1 and 2 when they arrived in Tallahassee and took them to have sex with men. Afterwards, Victims 1 and 2 complained about having to work as prostitutes. The two women told Melchor that they believed they were going to work as waitresses. After he explained the real nature of the work, both women agreed to do their best. Melchor remembered that one of the victims complained and cried a lot about working as a prostitute and indicated that she did not want to

---

[9]Victim 2's testimony regarding the events described above was substantially similar to Victim 1's.

9

work anymore, but on other occasions she stated that the work was tolerable because of the money. When asked if Victims 1 and 2 told him that they thought they would be working at a bar and not as prostitutes, Melchor stated that "at the beginning, yeah, they all [come] in with that thought." At some point, Monsalve called Melchor, and Melchor informed Monsalve that Victims 1 and 2 were complaining and did not want to work. Monsalve spoke directly to Victims 1 and 2, and both women started crying as soon as they spoke to Monsalve. Melchor stated that he did not hear the conversation between Monsalve and Victims 1 and 2 because he left the room. The women fled after their conversation with Monsalve.[10]

The district court sustained Monsalve's objections to the PSI's denial of a reduction for acceptance of responsibility but overruled Monsalve's other objections and adopted the PSI's findings and calculations. Notably, the district court found that: (1) the cross-reference in § 2G1.1(c)(1) applied because

---

[10]The government also called Luz Ramos, a female codefendant of Monsalve and Melchor. Ramos testified that her boyfriend supervised Monsalve's operation in Jacksonville. After Ramos's arrest, Monsalve instructed her to say that he was not the boss of the organization. When Ramos began cooperating with the government, Monsalve wrote letters to her, reminding her that he knew where her daughter and other family were located. Ramos stated that, upon receiving these letters, she feared for her family's safety.

On cross-examination, Ramos admitted that Monsalve never directly threatened her daughter or family in Columbia. Ramos stated, however, that she knew that Monsalve's wife, who had cheated on him, was afraid of returning to Columbia because he "would do something to her."

Monsalve's telephone conversation with Victims 1 and 2 was "an attempt, at least, to cause them to engage in sexual acts by placing them in fear"; (2) Monsalve's telephone comments were an overt, coercive act to make the women have sex, against their wills, to pay off their debts; (3) Monsalve talked to the women because they had "balked at engaging in sexual acts"; and (4) Victims 1 and 2 were crying after talking to Monsalve. The district court adopted the PSI's finding that the women initially were coerced into prostitution because they: (1) did not find out that they would be working as prostitutes until arriving in the United States illegally; (2) did not know anyone in the United States; (3) did not speak English; (4) had a $16,000 debt "hanging over [their] head[s]"; and (5) were threatened by Melchor, who was working under Monsalve's direction, that he would find them if they fled and could have them deported.

After granting a three-level reduction for acceptance of responsibility, the district court found that Monsalve's new adjusted offense level was 37. With Monsalve's criminal history category of I, his advisory guidelines range was 210 to 262 months' imprisonment. Monsalve declined to present anything further regarding the 18 U.S.C. § 3553(a) factors.

The district court imposed a sentence of 240 months' imprisonment. Monsalve appeals.

## II. DISCUSSION

Monsalve first argues that the district court erred in applying the cross-reference in § 2G1.1(c)(1) based on its finding of fear.[11] Monsalve argues that any finding by the district court regarding fear was based on equivocal and contradictory evidence because he specifically did not plead guilty or stipulate to Object 1 of Count 1.

Neither the guidelines nor the statutes referenced by the guidelines (namely, 18 U.S.C. § 2242) define "fear." However, our sister circuits have stated that "[t]he definition of 'fear,' as used in 18 U.S.C. § 2242(1), is very broad." United States v. Castillo, 140 F.3d 874, 885 (10th Cir. 1998) (citing United States v. Gavin, 959 F.2d 788, 791 (9th Cir. 1992)). "The element is satisfied when the defendant's actions implicitly place the victim in fear of some bodily harm." Id.; see also Gavin, 959 F.2d at 791 (stating that "the possible range of 'fear,' is very large").

Here, we cannot say the district court clearly erred in its fact finding that Monsalve placed Victims 1 and 2 in fear or in its application of the cross-reference

---

[11]We review a district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error. United States v. Vance, 494 F.3d 985, 994 (11th Cir. 2007).
  Monsalve uses the term "coercion" in referring both to the cross-reference in § 2G1.1(c)(1) and the enhancement in § 2G1.1(b)(1). We use the term "fear" in this discussion to refer to the cross-reference because that is the term used by 18 U.S.C. § 2242, which is listed in the cross-reference. See supra note 6; U.S.S.G. § 2G1.1(c)(1).

in § 2G1.1(c)(1). The fact finding is supported by the record. Victims 1 and 2 came to the United States thinking they would be waitresses. After arriving in the United States illegally, they were told they owed Monsalve a $16,000 smuggling fee and that they must repay him by working as prostitutes. They had their identification documents taken from them, spoke no English, and depended on Monsalve and his associates for food, water, shelter, and clothing. Melchor, one of Monsalve's managers, threatened Victims 1 and 2 that he could have them deported if they tried to escape. Moreover, Monsalve personally spoke to Victims 1 and 2 on the phone because they expressed to Melchor that they did not want to continue to prostitute themselves. This conversation left Victims 1 and 2 in tears, and Victim 2 slept with more men shortly thereafter. Because the district court's finding of fear satisfied the cross-reference requirement in § 2G1.1(c)(1), the district court was required to apply § 2A3.1.[12] See Pipkins, 378 F.3d at 1301.

Monsalve also argues that the district court erred in applying the vulnerable-victim enhancement under § 3A1.1(b) to count groups 1 and 2. Monsalve claims that Victims 1 and 2 showed no susceptibility to criminal conduct and that he did

---

[12]In his brief, Monsalve mainly argues that the district court erred in applying the four-level enhancement for coercion under § 2G1.1(b)(1). However, the PSI's calculations, which the district court adopted, reset Monsalve's base offense level in applying the cross-reference in § 2G1.1(c)(1), meaning the earlier coercion enhancement had no effect on Monsalve's sentence. Because we affirm the district court's application of the cross-reference in § 2G1.1(c)(1) and use of the offense level in § 2A3.1, Monsalve's challenge to the coercion enhancement is academic, and we need not address it.

not select the victims due to their vulnerability to the offense. Moreover, Monsalve asserts that it is error to rely solely on the victims' illegal status as a sign of their vulnerability because this status is a necessary element of the crime of alien smuggling.

Section 3A1.1(b) provides for a two-level enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(i). A "vulnerable victim" is "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Id. § 3A1.1 cmt. n.2(B). The adjustment should be applied only when "the defendant selects his victim due to the defendant's perception of the victim's vulnerability to the offense." United States v. Day, 405 F.3d 1293, 1296 (11th Cir. 2005) (quotation marks omitted) (concluding that elderly victims were vulnerable not because of their age, per se, but because the defendants repeatedly targeted the elderly individuals, demonstrating that the defendants knew the victims were particularly vulnerable).

The district court did not clearly err in finding that Victims 1 and 2 were vulnerable and therefore applying the vulnerable-victim enhancement.[13] The

---

[13]We generally review de novo the application of the vulnerable-victim enhancement, but the district court's determination of a victim's "vulnerability" is a factual finding given due deference. United States v. Amedeo, 370 F.3d 1305, 1317 (11th Cir. 2004).
  Monsalve acknowledges that he did not object explicitly to the victim-related

14

victims were vulnerable not because of being illegal aliens <u>per se</u>, but because they had no identity papers, and thus would be unlikely to report criminal conduct to the police, had no jobs or income for even basic necessities, making them susceptible to criminal conduct for income, and spoke no English and had no family in the United States or place to live other than what Monsalve provided, making them vulnerable to pressure to engage in criminal conduct. And because Monsalve repeatedly targeted women in Victim 1 and 2's situation, the district court could infer that Monsalve knew such victims were particularly vulnerable to criminal conduct.

For the foregoing reasons, we affirm Monsalve's sentences of 240 months' imprisonment.

**AFFIRMED.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

adjustments under § 3A1.1(b), but argues that he implicitly did so by objecting to the application of the § 2G1.1(c)(1) cross-reference, as the issue of coercion was common to both. Because we discern no error under any standard of review, we need not address whether Monsalve's objection preserved the issue for appeal.